

**Dated: December 30, 2020**

**The following is ORDERED:**

Sarah A Hall
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RHA Stroud, Inc., | ) | Case No. 20-13482-SAH |
| RHA Anadarko, Inc., | ) | Case No. 20-13483-SAH |
| Debtors. | ) | Chapter 11 |
| | ) | (Jointly Adminstered) |

**ORDER (A) GRANTING FP GROUP'S AMENDED MOTION TO DISMISS
OR ABSTAIN, WITH BRIEF, AND WITH NOTICE OF OPPORTUNITY FOR
HEARING [Doc. 65], AND (B) DENYING DEBTORS' MOTIONS FOR ENTRY OF
INTERIM AND FINAL ORDERS (i) AUTHORIZING THE HOSPITALS TO USE
CASH COLLATERAL; (ii) GRANTING CONDITIONAL ADEQUATE
PROTECTION TO THE SECURED PARTY, (iii) SCHEDULING A FURTHER
INTERIM HEARING; (iv) SCHEDULING A FINAL HEARING,
AND (v) GRANTING RELATED RELIEF [Doc. 4]**

The Court conducted a contested hearing on the following matters on December 15, 17,
and 18, 2020:

1.  FP Group's Amended Motion to Dismiss or Abstain, with Brief, and with Notice of
    Opportunity for Hearing [Doc. 65], filed on November 6, 2020, by Rural Hospital
    Acquisition, LLC ("RH Acquisition"), First Physicians Realty Group, LLC ("FP Realty"),
    First Physicians Business Solutions, LLC ("FP Business"), First Physicians Services,
    LLC ("FP Services"), and First Physicians Resources, LLC ("FP Resources"; RH
    Acquisition, FP Realty, FP Business, FP Services, FP Resources, collectively, "FP
    Group");

2.  United States Trustee's Response in Support of FP Group's Amended Motion to Dismiss
    or Abstain, with Brief in Support and Notice of Opportunity for Hearing [Doc. 195], filed
    on November 27, 2020, by the United States Trustee ("UST");

3.      Debtors' Response to FP Group's Amended Motion to Dismiss or Abstain, with Brief and Notice of Opportunity for Hearing [Doc. 197], filed on November 27, 2020, by RHA Stroud, Inc. "Debtor Stroud") and RHA Anadarko, Inc. ("Debtor Anadarko"; Debtor Stroud and Debtor Anadarko, collectively, "Debtors");

4.      FP Group's Reply to the Debtors' Response to the Motion to Dismiss or Abstain [Doc. 242],  filed on December 4, 2020, by FP Group;

5.      Debtors' Motions for Entry of Interim and Final Orders (i) Authorizing the Hospitals to Use Cash Collateral; (ii) Granting Conditional Adequate Protection to the Secured Party, (iii) Scheduling a Further Interim Hearing; (iv) Scheduling a Final Hearing, and (v) Granting Related Relief [Doc. 4], filed on October 25, 2020, by Debtors;

6.      Response of the United States Trustee to the Debtors' Motion for Use of Cash Collateral [Doc. 15], filed on October 27, 2020, by UST;

7.      Limited Objection to Debtors' Motion to Use Cash Collateral [Doc. 20], filed on October 27, 2020, by RH Acquisition;

8.      Rural Hospital Acquisition's Sur-Reply to the Debtors' Request to Use Cash Collateral [Doc. 266], filed on December 9, 2020, by RH Acquisition; and

9.      Debtors' Sur Sur Reply to Rural Hospital Acquisition's Sur-reply to the Debtors' Request to Use Cash Collateral [Doc. 268], filed on December 10, 2020, by Debtors.

This Court has jurisdiction of these matters pursuant to 28 U.S.C. §§ 1334, 157(a) and (b)(1).

After consideration of the documentary evidence and testimony presented during the hearing, as well as the arguments of counsel, the record in these jointly administered chapter 11 cases, and applicable law, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Debtors/One Cura Structure

1.      Debtors operate two licensed "Critical Access Hospitals,"[1] one in Stroud, Lincoln County, Oklahoma, and one in Anadarko, Caddo County, Oklahoma (collectively, the

---

[1]Generally, a "Critical Access Hospital" is a "rural hospital[] located 35 miles away from any other hospital or 15 miles away from any other hospital where the terrain is mountainous or where there is no access to a main road." In re Pioneer Health Services, Inc., 2018 WL 4812432 (Bankr. S.D. Miss. 2018).  Although other hospitals are in fact within 35 miles of Debtors' Hospitals, Debtors were "grandfathered in."

"Hospitals").  Each Debtor has 25 beds and emergency rooms.[2]

2.      Debtors are exempt non profits under Section 501(c)(3) of the Internal Revenue Code and are subject to numerous federal, state, and local laws and regulations, including licensing from the Oklahoma Health Care Authority and the Oklahoma State Department of Health.

3.      Charles Eldridge ("Eldridge") acquired Debtors in 2011.  Eldridge subsequently contributed his equity interests in Debtors to One Cura Wellness, Inc. ("One Cura"). Debtors are currently owned 100% by One Cura.  [Doc. 1 in both cases, List of Equity Security Holders].

4.      Eldridge is the president and a director of Debtors and is also the founder and sole employee of One Cura.

5.      Eldridge visits the Hospitals with some degree of regularity but no more than 3-4 times a year.  In 2020, he has not visited the Hospitals in large part due to travel restrictions associated with the Covid-19 pandemic.  However, Eldridge did travel to Oklahoma twice for litigation matters but did not visit the Hospitals.

6.      One Cura's only source of income is a "director's fee" paid by Debtors to One Cura.  One Cura pays Eldridge's salary, currently $225,000 annually, as its only employee.

**One Cura Acquisition of Debtors**

7.      As part of the purchase in 2011, Debtors executed notes in favor of RH Acquisition, which were later amended and restated in 2015, as follows: $5,928,028.05 by Debtor Anadarko and $8,097,684.06 by Debtor Stroud (collectively, the "Notes").  FP Exhibits 3 and 4.  The Notes are interest only, with quarterly payments, and the principal amounts are due and payable in full on March 31, 2021.  FP Exhibits 3 and 4.

8.      To secure the Notes, Debtors granted blanket liens on all Hospital assets[3] to RH Acquisition including accounts receivable and rights of Debtors to payment of money or any other form of consideration (the "Pre-petition Collateral").  FP Exhibit 12.

9.      Debtors operate on land and in facilities that are owned by FP Realty.  Debtors entered

---

[2]Debtor Anadarko also has a surgery department that is managed and staffed by Southern Plains Medical Group ("Southern Plains").  Debtor Anadarko receives no compensation from Southern Plains for allowing it to operate the surgery department.  Debtor Stroud has a surgery center but it is neither operational nor staffed.

[3]Debtors' assets consist of the operating Hospital and their licenses and permits, accounts receivable, equipment, supplies, cash on hand, and lease interests in the land and building on which the Hospitals operate.

into a lease with FP Realty for the Hospital land and facilities dated April 1, 2011 (the "Lease"). The Lease has a 20-year primary term commencing April 1, 2011, and is renewable. Monthly rent is set per Exhibit "B" to the Lease and provides for an automatic 3% increase in base rent for years 2-20. FP Exhibit 17.

10. The current aggregate monthly rent under the Lease owed by Debtors to FP Realty is approximately $110,000 per month.

11. The Hospitals' state licenses to operate are tied to the Hospitals' physical locations. The Medicare designations as Critical Access Hospitals are also tied to the physical locations and state licenses. Neither the Critical Access Hospital designations nor the state licenses are transferrable. Debtors cannot, therefore, reorganize without the long-term Lease of the physical locations and facilities.

12. Contemporaneous with the purchase, Debtors also entered into multiple contracts with the various members of the FP Group including (collectively, the "Service Contracts"):

FP Business – Management Services Agreements (the "MSAs") to furnish management and support services to Debtors. Debtors Exhibits 6 and 7.

FP Resources – Staff Leasing Agreements to lease clinical, administrative, and other personnel, physicians, and senior executives to Debtors. Debtors Exhibits 8 and 9.

FP Services – Ancillary Services Agreements to furnish information technology, diagnostic testing services, electronic health records, software and systems, management of professional services, and other ancillary services to Debtors. Debtors Exhibits 10 and 11.

13. Under Section 2(a) of MSAs, FP Business has the sole and exclusive right and obligation to furnish or perform or arrange for the furnishing or performance of the management services "in whatever manner" FP Business "reasonably determines is appropriate under the circumstances," and Debtors will "not interfere with or prevent . . . [FP Business] from carrying out its responsibilities under the [MSAs]." Debtors Exhibits 6 and 7, p. 2, ¶ 2(a).

14. The MSAs provide FP Group is not obligated to pay third-party vendors unless there are sufficient funds to do so. Debtors Exhibits 6 and 7, p. 5, ¶ 3(a)(xi). FP Group has always prioritized payment of third-party vendors over payment of its own fees, interest, and rent.

15. As a result of the Service Contracts: (a) FP Group handles all day-to-day operations and transactions for Debtors; (b) FP Group prepares the Hospitals' financial statements and provides them to Eldridge monthly; (c) Debtors have no employees as all physicians, medical staff, and other employees are retained by FP Group; (d) revenues generated by

the Hospitals are swept daily by FP Group and used to pay third-party vendors and a portion of its fees under the Service Contracts; (e) FP Group submits to Eldridge weekly cash disbursements by vendor, the cost report and supporting financial documentation, and a daily status on the Hospitals; and (f) FP Group maintains and has possession of Debtors' books and records.

16.     Eldridge provides oversight of Debtors and develops their policy, reviews and signs cost reports submitted to Medicare, works with community outreach, attempts, albeit unsuccessfully to date, to fund-raise and obtain grants, deals with Southern Plains, attends a variety of meetings, and works with consultants and the Hospitals' advisory boards.

17.     Eldridge described the arrangement between Debtors and FP Group as essentially a "hospital in a box" as FP Group provides the physical locations and buildings in which the Hospitals operate, the physicians and medical personnel and all other staff, completes all back office work, and performs all operation and information technology services for the Hospitals.

18.     Debtors generate significant revenues and cash flow but are not profitable and have not been so since 2014.

19.     Debtors have two sources of active cash flow: cash and check by patients deposited directly to the respective operating account for each Debtor and wires directly into Debtors' lockbox accounts from insurance, Medicare, Medicaid, Veterans Administration benefits,  and merchant services.

20.     A significant portion of Debtors' revenues is derived from Medicare reimbursements. Debtors are reimbursed based on cost reports submitted to Medicare once a year containing a breakdown of the reimbursable expenses.  It is critical that the costs reports be correct and are generally prepared by an expert in Medicare cost reimbursement. However, because of the structure of Debtors' operations and One Cura's lack of involvement therein, Debtors are entirely dependent on FP Group to provide the necessary accounting information to complete the cost reports.

21.     Medicare, which represents approximately 65% of Debtors' revenue, reimburses Critical Access Hospitals based on a formula of 101% of costs.  As a result, if costs are reduced, revenues from Medicare are also necessarily reduced although on a delayed basis.

22.     Debtors employ their own auditor, WithumSmith+Brown, P.C. ("Withum").  Withum prepared draft audited financial statements for 2016 - 2018 using accounting data and information provided by FP Group but have never finalized the financial statements.

23.     As paying agent for Debtors, FP Group weekly compiles third-party invoices and submits them to Eldridge for approval for payment.

24. Historically, Debtors' expenses and costs have exceeded cash flow, so FP Group prioritized payment of Debtors' third-party vendors, suppliers, and One Cura over the interest, rent payments, and fees due FP Group under the various contracts with Debtors, and then paid itself whatever was left. After payment of third-party invoices, One Cura's director's fee, and professional fees, there was never enough cash flow to pay FP Group in full. FP Group made the decision to not pay or otherwise defer its payments; neither Debtors nor One Cura directed such action.

25. FP Group prioritized any payment it received to its fees under the Service Contracts and then to interest on the Notes to try to keep the Notes current. Eldridge never directed any different payment priority of FP Group's fees and debts.

26. Debtors have never paid any rent under the Lease as there has not been sufficient cash flow.

27. Debtors have never paid any principal on the Notes and only minimal interest, again because there was always insufficient cash flow to pay third-party vendors, One Cura, FP Group's fees under their Service Contracts, rent under the Lease, and Note payments.

28. As of September 30, 2018, as part of an audit, Debtors recognized, and FP Group confirmed, the following amounts to be outstanding on the Notes and Lease:

| **Debtor** | **Note** | **Lease** |
|---|---|---|
| Debtor Anadarko | Principal $5,881,443 Interest $725,580 | Lease Payable $5,600,421 Accounts Payable $4,754,980 |
| Debtor Stroud | Principal $8,050,797 Interest $663,025 | Lease Payable $4,536,105 Accounts Payable $3,923,772 |

FP Exhibits 6, 7, 18, and 19.

**FP Group Fee Escalation and Negotiations**

29. Since 2011, FP Group's fees steadily increased, some years more than 30 - 40%. This increase was due in part to increased collections as fees charged by FP Group were tied to revenue collections, and revenue increased due to increased operations which required more staffing and services as the Hospitals were managing more patients.[4]

30. As a result, at some point, One Cura, Debtors, and FP Group began having discussions to

---

[4]Historically, FP Group's fees continually increased as did their profit from the Service Contracts with Debtors, resulting in profits of $17-19 million annually in 2017, 2018, and 2019. However, FP Group was never paid in full under the Service Contracts, the Notes, or the Lease.

renegotiate and lower costs to Debtors under the Service Contracts.

31.    FP Group's Service Contracts are not sustainable because they take more than 100% of revenue.

32.    In February 2019, Debtors and FP Group were negotiating a Staff and Provider Leasing Agreement (the "Amended Staffing Agreement"). Debtors Exhibit 15. Debtors Exhibit 15 is unsigned although Debtors claim it was executed and held in escrow until the other agreements were renegotiated and signed.[5]

33.    The Amended Staffing Agreement provides that FP Group shall "cure" the accrued, unpaid interest on the Notes and the unpaid rent on the Lease by the end of the Initial Term (February 2023). Debtors Exhibit 15, p. 5, § 3.1(l). The Amended Staffing Agreement is raised by Debtors and One Cura as a "Hail Mary" to defeat the accrued and unpaid interest on the Notes and rent payments under the Lease.[6]

34.    FP Group has not so cured but continued to pay its management fees.

35.    The Amended Staffing Agreement further provides for payment to One Cura of $62,500 per month per Debtor for oversight fees (reduced from the monthly $100,000 director's fee that was being paid to One Cura but above the original $25,000 a month director's fee

---

[5]The former CEO of FP Group, Sean Kirrane ("Kirrane"), also testified the Amended Staffing Agreement was executed and held in escrow by Debtors' counsel in the Bankruptcy Cases, Akerman L.L.P. ("Akerman"). Curiously, Akerman never came forward and indicated that it had signed copies of the Amended Staffing Agreement, and there is no evidence of any communication of any kind transmitting the signed Amended Staffing Agreement to Akerman or any other lawyer.

[6]While the Court need not conclude today if the Amended Staffing Agreement was signed and in effect, the Court would be remiss if it failed to point out problems with such an argument. Obviously, the first problem is no one seems to have a copy of the signed signature pages or the signed agreement - not the people who allegedly signed it nor the lawyers who were allegedly holding it in escrow. Similarly, given the plethora of attorneys involved in both the negotiations and relationship between FP Group and One Cura, no communication, whether by letter, email, or text, or even hand written notes from a telephone conference, reflect any of the lawyers directing their clients to sign the agreement and return it to be held in escrow. It is beyond reason to suggest a lawyer would hold something in escrow without written instructions. It is also telling that no lawyer involved in this transaction testified to receiving the signed signature pages and apparently having lost them. Finally, while Kirrane testified he signed it on behalf of FP Group, given his position to economically gain in these Bankruptcy Cases if they are not dismissed and FP Group's Service Contracts are rejected, and the litigious relationship between FP Group and him, and for all of the same reasons set forth above, his testimony must be taken with a grain of salt.

previously paid to One Cura). No other contract references the $62,500 per month per Debtor amount for One Cura's director's fees.

36.    The $62,500 per month per Debtor director's fee was authorized and paid by FP Group prior to and after the date of the Amended Staffing Agreement.

37.    Curiously, as of September 30, 2019, Debtors continued to recognize, and FP Group confirmed, the Lease payable balances and the accounts payable owed to FP Group under the Lease by Debtor:  Debtor Anadarko - $5,704,000; and Debtor Stroud $4,620,000.  FP Exhibits 21 and 22.

38.    In late 2019, as a continuation of their efforts to renegotiate and lower costs to Debtors under the Service Contracts, FP Group and One Cura met.  The meeting did not go well as One Cura wanted more money in the form of an increased director's fee and a joint venture arrangement with FP Group which is not permitted by Medicare.

39.    Subsequently, Eldridge renegotiated Debtor Anadarko's agreement with Southern Plains. The new agreement requires Debtor Anadarko to pay Southern Plains prior to charts being completed. As a result, Debtor Anadarko is required to pay Southern Plains without first confirming it can bill for the charges, putting the risk of non-reimbursement on Debtors rather than Southern Plains.

40.    In January 2020, Eldridge, without input from FP Group, reached out to third parties about possibly obtaining new management for the Hospitals, specifically Kirrane, Cohesive Healthcare Solutions ("Cohesive"), and Southern Plains, but nothing concrete developed at the time.

**Default and State Court Action**

41.    In January 2020, FP Group ceased remitting the monthly director's fee to One Cura and also ceased remitting payment of One Cura's professionals' fees.

42.    On February 17, 2020, RH Acquisition declared the payment of the Notes to be in default and the unpaid principal balance to be immediately due and payable, together with the unpaid accrued interest through February 14, 2020, and demanded immediate payment as follows:

| | | |
|---|---|---|
| Debtor Stroud | Principal $8,050,797.26 | Interest $719,315.10 |
| Debtor Anadarko | Principal $5,881,442.78 | Interest $1,010,547.82 |

FP Exhibits 8 and 9 (the "Note Demand Letters").

43.    On February 17, 2020, FP Realty also declared defaults under the Lease and demanded

-8-

immediate payment of the unpaid, outstanding rent of $10,324,000. FP Exhibit 20 (the "Lease Demand Letter").

44.    Eldridge, however, believed Debtors were current under the Notes and Lease since FP Group had the obligation to "cure" the payment defaults under the Notes and Lease by "wiping" it off the books under the Amended Staffing Agreement.

45.    Accordingly, Debtors did not respond to either the Note Demand Letters or the Lease Demand Letter, and Debtors did not remit payment on the Notes or the Lease.

46.    First Physicians then filed a lawsuit against Debtors seeking money judgment on the Notes and the Lease, to evict Debtors from the land and facilities, and to appoint a receiver in the District Court of Lincoln County, State of Oklahoma (the "District Court"), Case No. CJ-2020-513 (the "State Court Action").

47.    Eldridge viewed the State Court Action as a threat to Debtors' ability to keep operating the Hospitals and providing health services in Stroud, Anadarko, and their surrounding communities as he believed the proposed receiver, David Rhoades ("Rhoades"), would liquidate and sell the Hospitals.

48.    FP Group asked for the appointment of a receiver because a receiver was the best way to protect patients, the Hospitals, and their licenses during the litigation. A receiver needed to be in place before FP Group obtained an order of eviction to protect the licenses, the provider agreements, and the patients in the Hospitals.

49.    On September 14, 2020, the District Court held a hearing on RH Acquisition's and FP Realty's motion for appointment of a receiver in the State Court Action. FP Exhibit 73. Following the hearing, the District Court entered its Order on September 25, 2020 (the "Receiver Order") in which the Court found Debtors to be insolvent, the Hospitals to be running smoothly and efficiently, the Notes and the Lease to be in default with amounts "undisputably" owed thereunder, and the relationship between FP Group and Debtors to be broken down and "toxic." FP Exhibit 72, p. 3. As a result, the District Court concluded a receiver was necessary to "neutralize the parties" during the State Court Action in order "to aid the [H]ospitals to continue their successful operations." FP Exhibit 72, p. 3. The Receiver Order further directed the parties to submit an agreed order appointing a receiver.

50.    Eldridge was surprised by the Receiver Order in the State Court Action and had been content to litigate his disputes with FP Group in the State Court Action until such order was entered.

**Bankruptcy Cases**

51.    Debtors' boards authorized the bankruptcy filings on October 13, 2020, which coincides with inquiries made by Debtors' counsel through the UST regarding the Court's

availability for first day hearings.[7]

52.   Debtors filed their chapter 11 bankruptcy cases on Sunday, October 25, 2020 (the "Petition Date"). [Doc. 1 in Case No. 20-13482 and 20-13483 (the "Bankruptcy Cases")]. The Bankruptcy Cases are being jointly administered.

53.   Per Eldridge, Debtors sought bankruptcy protection because: (i) Debtors' losses were impacting Debtors' mission as they could not expand services (because FP Group refused to expand); (ii) operating costs kept increasing as FP Group's fees increased beyond Debtors' cash flow and FP Group refused to renegotiate; (iii) Debtors needed to reject the FP Group contracts; (iv) a receiver had been appointed which impaired Debtors' mission to provide quality health care to their communities; and (v) bankruptcy would turn off FP Group's sweep of Debtors' lockbox accounts and allow money to be paid to One Cura and its professionals.

54.   Prior to the Bankruptcy Cases, FP Group paid the Hospital vendors current in the ordinary course of business, and no vendors had threatened action against or demanded different terms from the Hospitals pre-bankruptcy.  In fact, the Hospitals had very good vendor relations pre-bankruptcy.

55.   The only payments FP Group disputed and withheld pre-bankruptcy were payments to One Cura and its professionals.

56.   When the Bankruptcy Cases were filed, Debtors were not current on the interest due on the Notes and had made no rent payments under the Lease.  As of the date of the hearings on the Motions to Dismiss, Debtors had paid, post-petition, no interest on the Notes and no rent under the Lease.

57.   On the Petition Date, the aggregate amount owed by Debtors on the Notes totaled $14,025,712.11, exclusive of accrued and unpaid interest.

58.   The amounts due under the Lease as of November 30, 2020, are: Debtor Anadarko $6,352,936; and Debtor Stroud $5,145,611.

59.   Debtors made no effort to forewarn, much less coordinate with, FP Group regarding the filing of the Bankruptcy Cases notwithstanding that FP Group operates and manages Debtors.  Adrian Reeder, FP Group's CFO, learned of the bankruptcy filings through a colleague who received a news article on October 26, 2020.

60.   Similarly, neither Debtors nor One Cura reached out to Debtors' vendors in advance of the filing of the Bankruptcy Cases which is not surprising given that FP Group, rather

---

[7]This was not the first time bankruptcy was discussed as an option for Debtors. Bankruptcy was debated as early as February 2020 when the State Court Action was filed.

than Eldridge and One Cura, has the relationships with Debtors' vendors and service providers. This serves to highlight Eldridge's and One Cura's remoteness from Debtors' operations. As a result, vendors and suppliers were surprised and took actions to protect themselves upon learning of the Bankruptcy Cases, such as shutting down service, freezing accounts, and demanding payment in full on post-petition accounts. This took place during a time of high occupancy in the Hospitals - and all hospitals - due to the Covid-19 pandemic. If the Hospitals were unable to get the supplies and services needed for patients, then the Hospitals would need to transfer the patients to other hospitals; however, due to the Covid-19 pandemic, the Hospitals were unable to transfer due to high occupancy rates, thus putting patients in jeopardy. FP Group was put in the untenable position to "beg" for supplies and services and was required to make immediate payment for services and supplies to ensure patient protection.

61.     The bankruptcy filing by Debtors also caused a contractual payment due to Southern Plains[8] not to be paid; such payment would have been made in the ordinary course but for the bankruptcy filing.[9]

62.     While Debtors' Schedules reflect numerous pre-petition creditors, a closer analysis of the accounts payable attached thereto reveals the vast bulk of the creditors arise from a time prior to Debtors being acquired by Eldridge/One Cura in 2011 and are likely stale, with the majority of the remaining creditors having current debt unpaid as a result of the mid-month bankruptcy filing.

63.     Debtors do not have sufficient cash flow post-petition to cover their operating expenses, Note payments, Lease payments, professional payments, UST fees, and patient ombudsman's fees.

64.     The Court approved Debtors' continued use of cash collateral at the conclusion of a hearing held on November 2, 2020.

65.     On November 11, 2020, this Court entered the Order Authorizing the Hospitals' Interim Use of Cash Collateral and Scheduling a Final Hearing (the "Interim Cash Collateral Order"). Doc. 100. The Interim Cash Collateral Order provides for FP Group to continue to act as paying agent for Debtors and to compile and submit third-party invoices to Eldridge for payment approval. Once submitted, Eldridge has 36 hours to review and approve the invoices for payment. Eldridge has not satisfied this obligation in at least two, if not three, instances post-petition.

---

[8]Southern Plains manages and staffs the outpatient surgery center at Debtor Anadarko.

[9]Southern Plains is a creditor paid current except for the first three weeks of October, 2020, due to the bankruptcy filing. Southern Plains **has not objected** to the Motion to Dismiss. Terms are net 10.

66.   FP Group filed the Motion to Dismiss on November 6, 2020.[10]

67.   On November 7, 2020, one day after the Motion to Dismiss was filed, Eldridge contacted Kirrane to determine his interest in providing management and staffing services to Debtors.  Kirrane had previously spoken to Eldridge in January 2020 in general terms but there had been no follow-up.

68.   Nine days later, by motions filed on November 16, 2020, Debtors sought to reject the FP Contracts, excepting only the Lease, and to enter into new management services agreements with Arcadia Health Partners ("Arcadia") as manager of the Hospitals (the "Arcadia Proposal").  See Doc. 130 and 134.

69.   Arcadia is a company formed by Kirrane[11] in November 2020, after the Motion to Dismiss was filed.  Arcadia is not currently registered to do business in Oklahoma, has no employees, no contracts, no cash on hand, no office other than Kirrane's home, and no business at the time of the hearing.

70.   The Arcadia Proposal proposes to bring together several key individuals instrumental, per Kirrane, for the way the Hospitals operate today, Cohesive and Southern Plains, in a joint venture of sorts to operate the Hospitals.  Kirrane has no contracts with any of the individuals, Cohesive, or Southern Plains committing them to the "gentleman's agreement," the timing thereto, or the pricing.  Additionally, the Arcadia Proposal would affect a wholesale replacement of the management, physicians, medical staff, and all other employees at Debtors notwithstanding the excellent patient care being provided by the current staff as per Eldridge.  Debtors Exhibit 18.

71.   The Arcadia Proposal includes lowering some costs through reduced management fees and assumes the savings from the lowered costs will be allocated to new, more productive service lines, such as outpatient surgery or opening the surgery center at Stroud.  This would require an investment in personnel until the Medicare cost reimbursement catches up.  A reimbursement expert is required, however, to develop that plan and one has not been retained.

72.   The Arcadia Proposal reduces costs to Debtors through payment of lower management fees.  While FP Group gets reimbursed for actual costs plus a 100% markup, Arcadia will get reimbursed for actual costs plus a 75% markup.

---

[10]FP Group filed the original Motion to Dismiss on November 5, 2020.

[11]Kirrane is the former CEO of FP Capital Group.  Kirrane was terminated by FP Capital in late 2019, and is currently in litigation with FP Group.  During his term as CEO of FP Group, Debtors never generated sufficient revenue to pay FP Group in full.  Since terminated in late 2019, Kirrane has not been employed.

73. Kirrane does not know the current patient load at each Hospital or the number of staff each Hospital requires.

74. Kirrane recognizes the structure of the FP Group management fee is consistent with the industry model of a performance fee (fee increases as revenues increase) in order to reward better performance.

75. No financing is lined up or even preliminarily lined up but Debtors and Kirrane intend to look for donors and debtor-in-possession financing. However, Debtors first need a plan to lower costs before focusing on financing.

76. The parties dispute the effect of decreasing costs on Debtors' overall revenues. The 25% reduction in management fees between FP Group and Arcadia, while saving in costs, does not translate to a 25% cash flow savings that can be used for other purposes because Medicare reimburses based on a formula of 101% of costs. Consequently, a decrease in actual costs will necessary decrease Medicare revenue since its reimbursement is tied to 101% of costs. Some adjustments to revenue may be necessary given the mix of payment sources at each Hospital.

77. Kenneth DeGraw ("DeGraw"), with Withum, prepared a 13-week cash budget for Debtors. However, DeGraw has no experience with Medicare reimbursement, never worked with a Critical Access Hospital before, and did not investigate these matters prior to preparing the 13 week cash budget supporting Debtors' use of cash collateral. He admitted he looked at the impact of the Arcadia Proposal only from the impact on costs but not at all for its impact on revenues and further *wrongly assumed* a reduction in cost would positively impact cash flow available to satisfy creditors. He looked solely at savings and aggregate cash flow, not knowing how Medicare reimbursement worked and not taking into account that decreasing costs would decrease Medicare reimbursement. DeGraw was instructed to just to look at costs and cost savings. Debtors Exhibit 2.

78. As a result, DeGraw's comparison of FP Group's costs to the Arcadia Proposal costs only looks at the cost savings while using the revenue levels generated by FP Group under its existing Service Contracts *notwithstanding approximately 65% of Debtors' revenues being tied to costs subject to Medicare cost reimbursement rules.*

79. Additionally, based on the timing of cost reports filed with Medicare, Debtors will continue to be paid based on past cost levels and will, assuming costs are reduced under the Arcadia Proposal, receive more Medicare reimbursement than entitled to until the cost reports are adjusted down. Medicare will seek repayment of any overpayment. If repayment cannot be immediately made, then Medicare will start recoupment at 100% of future reimbursements unless a payment plan is worked out. Any overpayment bears interest at 9.375%.

80. DeGraw's 13 week budget also includes no Lease payments to FP Realty and no adequate

protection to RH Acquisitions.  Being a cash budget, it also fails to include accrued but unpaid fees and expenses of Debtors' professionals in the Bankruptcy Cases (which the Court notes, given the rates on file and the known time involved by many professionals to date, will be significant).  Debtors Exhibit 2.  Even without these expenses, however, the 13-week cash budget reflects at the end of the 13 weeks Debtors will have unpaid accrued expenses in excess of $7.9 million just in management fees due FP Group for which no provision for payment has been made other than the re-allocation of costs savings (which necessarily reduce collections).  Debtors Exhibit 2.  Thus, under Debtors' own proposed budget, Debtors become more administratively insolvent every week without payment of professional fees, rent under the Lease, or interest on the Notes.

## CONCLUSIONS OF LAW

11 U.S.C. § 1112(b) (1) provides: "on request of a party in interest, and after notice and a hearing, the court shall . . . convert . . . or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under Section 1104(a) of a trustee or an examiner is in the best interests of creditor and the estate."   The burden of proof to show cause for dismissal of a chapter 11 case rests on the movant by a preponderance of the evidence.  In re G3 Marina Adventures LLC, 2010 WL 4736212, at *3 (Bankr. E.D. Okla. 2010) (citing In re Forest Hill Funeral Home & Memorial Park, 362 B.R. 808, 819 (Bankr. E.D. Okla. 2007)).  If "cause" for conversion or dismissal under Section 1112(b) is established by the moving party, the debtor must show that, despite such cause, there exists a reasonable prospect of reorganization within a reasonable amount of time.  Vista Foods U.S.A. Inc. v. Official Unsecured Creditors Committee (In re Vista Foods U.S.A. Inc.), 226 B.R. 284, (10th Cir. BAP 1997) (citations omitted).  If cause is found, the Court must dismiss the bankruptcy case.  Muth v. Muth (In re Muth), 514 B.R. 719 (10th Cir. BAP 2014)).

Section 1112(b)(4) sets forth a non-exclusive list of "cause" for dismissal, including substantial loss or diminution to the  estate and the absence of a reasonable likelihood of rehabilitation.  Muth, 514 B.R. 719. However, bankruptcy courts can dismiss a chapter 11 case for reasons other than those set forth in Section 1112(b)(4) as long as those reasons constitute "cause."  In re TCR of Denver, LLC, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) (citing 7 Collier on Bankruptcy ¶ 1112.01[2][a], at 1112-8-1112-9 (15th ed. Rev. 2005)).  Bad faith is recognized as a ground for dismissal under Section 1112(b).  Muth, 514 B.R. 719.  Both of these grounds are lodged as grounds for dismissing this bankruptcy case.

-14-

I.      **SUBSTANTIAL OR CONTINUING LOSS TO OR DIMINUTION OF THE
        ESTATE AND THE ABSENCE OF A REASONABLE LIKELIHOOD OF
        REHABILITATION JUSTIFIES DISMISSAL.**

11 U.S.C. § 1112(b)(4)(A) provides:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on
> request of a party in interest, and after notice and a hearing, the
> court shall convert a case under this chapter to a case under chapter
> 7 or dismiss a case under this chapter, whichever is in the best
> interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 1104(a) of a trustee
> or an examiner is in the best interests of creditors and the estate.
> . . .
>
> (4) For purposes of this subsection, the term "cause" includes--
>
> > (A)     substantial or continuing loss to or diminution of the
> >         estate and the absence of a reasonable likelihood of
> >         rehabilitation;

Cause under Section 1112(b)(4)(A) for dismissal "requires *both* a substantial or continuing loss
to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation." In re
Vaughan Co., Realtors, 2013 WL 2244285 (Bankr. D. N.M. 2013).  In evaluating cause for
dismissing a chapter 11 case, courts must remain cognizant of the two recognized policies of
chapter 11 of preserving going concerns and maximizing property available to satisfy creditors.
In re Landmark Atlantic Hess Farm, LLC, 448 B.R. 707, 713 (Bankr. D. Md. 2011).

        Several facts show a continuing diminution in Debtors' bankruptcy estates.  The evidence
before the Court was that Debtors commenced the bankruptcy cases with $3.1 million in cash on
hand and that substantially less, although not quantified, remains on hand today.[12]   In addition,
Debtors are not paying interest on the Notes, rent under the Lease, or any professional fees.
However, all of these expenses are accruing and will continue to accrue.  Similarly, Debtors are
not paying FP Group's management fees in full, and these also continue to accrue on a post-
petition basis.   And, Debtors will soon have to pay UST quarterly fees based on disbursements
in these Bankruptcy Cases.  28 U.S.C. § 1930(a)(6). All of these expenses are also administrative
expenses subject to priority in payment.  Where, during the pendency of a bankruptcy case, a
debtor's assets decline, cash declines, and administrative expenses and professional fees accrue,
there has been a substantial loss to the estate.  In re Neighbors, 2015 WL 9435189 (Bankr. D.
Kan. 2015).  To add insult to injury, Debtors have not, and currently do not have sufficient post-

---

[12]Debtors' own 13 week cash budget prepared by DeGraw reflects a zero cash balance at
the beginning of the 13 weeks, with $610,000 (Anadarko) and $250,000 (Stroud) in cash reserves
by the end of the first week.  Debtors Exhibit 2.

petition cash flow to cover operating expenses, Note payments, Lease payments, professional payments, UST fees, and patient ombudsman fees. Negative cash flow alone can establish a continuing loss or diminution of the estate under Section 1112(b)(4)(A). In re McTiernan, 519 B.R. 860, 866 (Bankr. D. Wyo. 2014). Clearly, Debtors' estates are suffering a substantial and continuing loss or diminution in value during these bankruptcy cases.

With respect to Debtors having an absence of a reasonable likelihood of rehabilitation,[13] "[r]ehabilitation signifies something more, such as 'to put back in good condition' or 'to re-establish on a firm, sound basis.' It contemplates the successful maintenance or reestablishment of a debtor's business operations." In re W. States, Inc., 2018 WL 627465, at *6 (Bankr. D. Wyo. 2018) (quoting In re ARS Analytical, LLC, 433 B.R. 848, 862 (Bankr. D. N.M. 2010)). Debtors' rehabilitation relies on a loose arrangement with Kirrane (the former CEO of FP Group who is currently in litigation with FP Group), Arcadia (a newly formed entity with no employees, assets, or authority to conduct business in Oklahoma), Cohesive, and Southern Plains, and post-petition financing, the search for which has barely commenced. There are no contracts or agreements, only "arrangements" which purport to save Debtors substantial cash flow in costs which Debtors propose to reallocate into new service lines. Those new service lines, however, have also not been identified and researched, much less developed into a plan capable of producing substantial cash flows.

Moreover, because 65% of Debtors' revenues are based on 101% of their costs due to Medicare reimbursement, revenues will necessarily be reduced as well, making any reallocation of cost savings doubtful. With Debtors' required increased cash flow expressly dependent upon these cost savings to implement new service lines, Debtors' plan for becoming financially sound fails. On top of these issues is Eldridge's and One Cura's past involvement, or lack of involvement, in the operations and management of Debtors, which has resulted in an absence of any in-depth knowledge of Debtors' operations and business affairs. They would need to obtain a huge amount of information and documentation to get up to speed in these cases and attempt to satisfy their duties as debtors-in-possession.

Debtors also do not own the land on, and buildings in, which the Hospitals operate. Rather, FP Realty owns the land and buildings and leases them to Debtors under the Lease. The Hospitals' licenses are tied to the physical locations of the Hospitals and cannot be transferred. However, (i) the Lease may have been terminated pre-petition; or (ii) if the Lease has not terminated, Debtors have never paid rent under the Leases, dating back to 2011, and Section 365(b) requires all accrued, unpaid rent to be cured as part of any assumption of the Lease (if not already terminated). While Debtors claim FP Group was required to "cure" the accrued, unpaid

---

[13]The Court does not believe it premature to consider whether Debtors' have a reasonable likelihood of rehabilitation. "If the Court had to wait until a debtor files a plan to consider whether it has a prospect for rehabilitation, no case could be dismissed under [Section 1112(b)(4)(A)] for at least four months." In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 302 (Bankr. D. Del. 2011). Section 1112(b)(4)(A) imposes no time restraint on when a motion to dismiss may be filed and considered by bankruptcy courts.

rent under the Amended Staffing Agreement, such claim will need to be litigated, and success is doubtful based on the facts provided.

Additionally, RH Acquisition's liens encumber all of Debtors' assets. While Debtors claim the absolute priority rule does not apply to nonprofit entities, the Court views the issue differently given the specific facts of these Bankruptcy Cases. One Cura owns 100% of the equity interests in Debtors – unlike the cases cited by Debtors where the debtors had no equity interests. In re Independence Village, Inc., 52 B.R. 715, 726 (Bankr. E.D. Mich. 1985); In re Otero County Hospital Assoc., Inc. 2012 WL 5376623 (Bankr. N.M. 2012). No legitimate argument can be made that the equity interests owned by One Cura should not be inferior to the interests of all creditors of Debtors with no retention of its interests in Debtors unless all creditors are paid in full. One Cura receives monthly director's fees in the aggregate amount of $125,000 per month undoubtedly as a result of its equity interest. In this Court's opinion, it is likely that the absolute priority rule will apply to Debtors and poses a substantial impediment to the likelihood of rehabilitation given the size of claims held by FP Group, including the secured claim of RH Acquisition. "While Chapter 11 debtors should be 'given a fair opportunity to reorganize,' they 'should not be permitted to continue in a futile effort to reorganize' at the expense of creditors." Vista Foods U.S.A. Inc. v. Official Unsecured Creditors Committee (In re Vista Foods U.S.A. Inc.), 226 B.R. 284, (10th Cir. BAP 1997) (quoting In re Macon Prestressed Concrete Co., 61 B.R. 432, 436 (Bankr. D. Ga. 1986)). Here, FP Group is bearing the economic brunt of Debtors' reorganization efforts.

FP Group established a continuing loss to the estates and the absence of a likelihood of rehabilitation, and Debtors failed to counter the absence of a likelihood of rehabilitation within a reasonable time. Their operating expenses exceed cash flow even without consideration of rent under the Lease, interest, much less principal, on the Notes, and professional and UST fees. Additionally, their plan for increasing cash flow is based on false assumptions and speculative cost savings and reinvestments. Cause, therefore, exists under Section 1112(b)(4)(A) to dismiss these Bankruptcy Cases. In re Golden Park Estates, LLC, 2015 WL 3643479 (Bankr. D. N.M. 2015); In re Westgate Properties, Ltd., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (cause exists because of post-petition losses and no showing of ability to reorganize or rehabilitate); In re Landmark Atlantic Hess Farm, LLC, 448 B.R. 707, 714 (Bankr. D. Md. 2011).

## II.    DEBTORS' BAD FAITH IS CAUSE FOR DISMISSAL.

Although not enumerated as cause for dismissal under Section 1112(b)(4), bankruptcy courts have overwhelmingly found that bad faith in filing a chapter 11 petition may be cause for dismissal. In re eFusion Services, LLC, 2014 WL 5293415 (Bankr. D. Colo. 2014) (citing Muth v. Muth (In re Muth), 514 B.R. 719 (10th Cir. BAP 2014)). FP Group bears the initial burden to establish cause under Section 1112(b) by a preponderance of the evidence. In re LJBV Ltd., 544 B.R. 401, 405 (Bankr. N.D. Ill. 2016); In Forest Hill Funeral Home & Memorial Park, 364 B.R. 808, 819 (Bankr. E. D. Okla. 2007); G3 Marina Adventures, 2010 WL 4736212, at *3. Bad faith is determined on a case by case basis but ultimately rests on the sound discretion of the bankruptcy court. G3 Marina Adventures, 2010 WL 4736212, at *3; Forest Hill, 364 B.R. at

821.

"In determining whether a debtor has acted in bad faith, courts, in general, consider any factors which indicate that a petition was filed to abuse the purposes of the Bankruptcy Code, or to delay or frustrate the legitimate efforts of creditors to enforce their rights." Winslow v. Williams Group (In re Winslow), 949 F.2d 401 (10ᵗʰ Cir. 1991)). Given that good faith is an amorphous concept, the Court's inquiry must be fact-intensive on a case by case basis. Forest Hill, 364 B.R. at 820 (citing In re Okoreeh-Baah, 836 F.2d 1032, 1033 (6ᵗʰ Cir. 1988)). Bad faith as cause for dismissal under Section 1112(b) "ha[s] been predicated on certain recurring but non-exclusive patterns, and [is] based on multiple factors rather than on any single event." eFusion, 2014 WL 5293415 (citing In re Walck, 2012 WL 2918492, at *5 (Bankr. D. Colo. July 17, 2012) (Slip Copy) (citing In re Nursery Land Development, Inc., 91 F.3d 1414, 1416 (10ᵗʰ Cir.1996); In re Plumberex Specialty Products, Inc., 311 B.R. 552, 560 (Bankr. C.D. Cal. 2004); In re Gunnison Ctr. Apts., 320 B.R. 391, 400 (Bankr. D. Colo. 2005); In re Kasdorf, 64 B.R. 294, 295 (Bankr. D. Colo. 1986))).

A bankruptcy court within the Tenth Circuit phrased the relevant factors to review in considering if a filing was made in bad faith as: (i) whether petition serves a valid bankruptcy purpose by preserving going concern value or maximizing value of estate; (ii) whether petition was filed to gain tactical advantage in litigation; (iii) whether financial problems are essentially a two-party dispute that can be resolved in state court litigation that is pending; (iv) whether it is a single asset case; (v) whether there are very few unsecured creditors; (vi) whether there is no ongoing business or employees; (vii) whether the debtor's pre-petition conduct has been improper; (viii) whether the case is filed to evade one or more court orders. Melendez Concrete, 2009 WL 2997920 (Bankr. D. N.M.) (citing In re Integrated Telecom Express, Inc., 384 F.3d 108 (3d Cir. 2004); In re Nursery Land Development, Inc., 91 F.3d 1414, 1415 (10ᵗʰ Cir. 1996)). Individual factors, alone, may not lead to a conclusion that a bankruptcy filing is in bad faith, and no single factor is determinative. Forest Hill, 364 B.R. at 820. Rather, the Court must look at the totality of the circumstances and determine if the cumulative effect of these case specific factors, gives rise to an inescapable conclusion that use of the bankruptcy process by the debtor is inappropriate. eFusion, 2014 WL 5293415 (citing In re Walck, 2012 WL 2918492, at *5 (Bankr. D. Colo. July 17, 2012) (Slip Copy) (citing In re Nursery Land Development, Inc., 91 F.3d 1414, 1416 (10ᵗʰ Cir.1996); In re Plumberex Specialty Products, Inc., 311 B.R. 552, 560 (Bankr. C.D. Cal. 2004); In re Gunnison Ctr. Apts., 320 B.R. 391, 400 (Bankr. D. Colo. 2005); In re Kasdorf, 64 B.R. 294, 295 (Bankr. D. Colo. 1986))). Determining whether a debtor's bankruptcy filing is in good faith requires the bankruptcy court to conduct an "on-the-spot evaluation" of the debtor's financial condition, motives, and the local financial realities. In re Gunnison Ctr. Apts., LLC, 320 B.R. 391, 399-400 (Bankr. D. Colo. 2005).

In assessing a debtor's intent, the Court must determine the debtor's primary motivation for filing chapter 11. In re Bullseye Energy, LLC, 2020 WL 6928198 (Bankr. N.D. Okla. 2020). Motivation of those who cause a debtor to file bankruptcy is relevant to a determination of whether a case was filed in good faith. Forest Hill, 364 B.R. at 821. Courts should look at the conduct of those in control of the debtor leading the bankruptcy filing for indicia of bad faith.

Forest Hill, 364 B.R. at 821.  Debtors' stated motivation for filing the chapter 11 cases was to reject the FP Group's Service Contracts to reduce operating costs[14] and expand services by reallocating the cost savings, turn off FP Group's ability to sweep their lockbox accounts and allow One Cura and its professionals to be paid, and avoid the consequences of the appointment of a receiver in the State Court Action.  Obtaining the protections of the automatic stay and the benefits of lease and contract rejection under Section 365 alone do not support a bad faith finding.  In re Surgical Associates, Inc., 2013 WL 1176233 (Bankr. N.D. Okla. 2013)); In re Colony Beach & Tennis Club Association, Inc., 2010 WL 746708 (M.D. Fla. 2010) (citing In re Balboa Street Beach Club, Inc., 319 B.R. 736, (Bankr. S.D. Fla. 2005)); In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003); In re Integrated Telecom Express, Inc., 384 F.3d 108, 115-116 (3d Cir. 2004); In re Chameleon Systems, Inc., 306 B.R. 666, 669-670  (Bankr. N.D. Cal. 2004). However, prioritizing payment to One Cura and its professionals over payment of creditors, including FP Group, is indicative of Debtors' true motives for filing these Bankruptcy Case.

The Court looks at a total of nine different facts indicative of Debtors having a bad faith motive in filing these bankruptcy cases:

1.  Whether the debtor has only one asset - Not applicable.  Debtors certainly have more than one asset.  Each Debtor owns an operating Hospital, the personal property used therein, the licenses and permits, Medicare designation as a Critical Access Hospital, cash, and accounts receivable.  Debtors' assets do not include the land or the physical plant in which Debtors operate the Hospitals, only the leasehold rights thereto (if they have not been terminated).

2.  Whether the debtor has only one creditor/is it essentially a two-party dispute - Undoubtedly, RH Acquisition and FP Group are Debtors' largest secured and unsecured creditors.  While other creditors exist, they are relatively small in number and amount as FP Group was current with third-party vendors until the Petition Date precluded continued payment in the ordinary course.  While a significant amount of old debt exists, such debt predates One Cura's acquisition of Debtors in 2011 and likely are stale.  Additionally, Debtors' motives are subject to question because FP Group had prioritized

---

[14]From all accounts, Debtors cannot afford the Service Contracts with FP Group. However, Debtors cast these contracts as being onerous and almost nefarious.  The paradox is Debtor negotiated and voluntarily entered into the Service Contracts and agreed to the fee structure thereunder.  The fee structure did not change, and by all accounts, patient care and hospital management is excellent.  However, something changed between Debtors and FP Group but it does not appear to be the result of any bad actions by FP Group, who deferred its own compensation, interest payments, and rental payments to keep Debtors' vendors "current" until Debtors filed bankruptcy, over which FP Group had no control.  The Court surmises that the demand for higher fees for One Cura when FP Group was not being paid in full as a creditor caused the irreconcilable split between FP Group and One Cura.

payment of third-party trade vendors who were essentially current but for Debtor's October 25 bankruptcy filing. And, Eldridge confirmed the primary motivation was to shut off FP Group's ability to sweep the lockbox accounts so that One Cura and its professionals could be paid - *not to obtain payment for third-party vendors.*

No creditors or taxing authorities were applying pressure to Debtors. In re Four Wells Limited, 2016 WL 1445393 (6th Cir. BAP 2016). In fact, the only creditors asserting any pressure on Debtors are RH Acquisition, who holds a lien on all assets of Debtors, and FP Realty, who is Debtors' landlord and has never received any rent for the Hospital facilities either pre-petition or post-petition. RH Acquisition and FP Realty sought to enforce their rights as creditors in the State Court Action, during the pendency of which FP Group ensured that third-party vendors were paid in the ordinary course of business. No creditor benefitted from this bankruptcy filing; rather, the bankruptcy filing kept third-party vendor creditors from being paid in the ordinary course of business. The only creditors who stand to benefit are Debtors' owner, One Cura, and its professionals, neither of which have been paid since January 2020.

While the FP Group is comprised of several different entities, they are all affiliated entities. A two-party dispute can exist when the other parties involved are affiliates. In re Clement Cattle Co, LLC, 2015 WL 4197044 (Bankr. N.D. Tex. 2015); In re State St. Houses, Inc., 305 B.R. 726, 736–37 (Bankr. S.D. Fla. 2002), aff'd, 305 B.R. 738 (S.D. Fla. 2003), aff'd, 356 F.3d 1345 (11th Cir. 2004). These Bankruptcy Cases are a two-party dispute between Debtors and FP Group that can be resolved in the State Court Action which has pended for over 10 months.

3.  <u>Whether the debtor acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure</u> - Not applicable.

4.  <u>Whether the debtor was revitalized on the eve of foreclosure to acquire the insolvent property</u> - Not applicable.

5.  <u>Whether the debtor has no ongoing business or employees</u> - The Hospitals are open and operating. However, while Debtors own the Hospitals, Debtors do not operate and manage the Hospitals, and Debtors have no employees. Rather, prior to and after the Petition Date, FP Group operated the Hospitals, employed the entirety of the staff at the Hospitals, was in possession of their books and records, and was the paying agent for the Hospitals. As the Debtors' own 2004 Motion makes clear, Debtors were not directly involved in the day-to-day operations of the Hospitals and had no employees who could operate and manage the Hospitals before or after the Petition Date.

6.  <u>Whether the debtor lacks a reasonable possibility of reorganization</u> - This is perhaps the most significant factor in the Court's analysis. The Court cannot see any path for Debtors to reorganize due to several critical facts. First, Debtors do not own the land and facilities in which they operate; FP Realty does and leases it to Debtors. However, no rent has ever

been paid on the Lease, and any assumption of the Lease would require past-due, unpaid rent to be paid in order to assume the Lease.[15]  11 U.S.C. § 365(b)(1)(A).  Second, the Lease may be terminated.  65% of Debtors' revenues come from Medicare, and the Medicare designation is tied to the land and facilities owned by FP Realty and leased to Debtors.  If the Lease has terminated, another issue which would have to be litigated, FP Realty cannot be forced to continue leasing the land and facilities to Debtors, and this is a death knell to Debtors.

Third, Debtor has not made a profit since 2014, even without paying any rent under the Lease, interest on the Notes, much less principal on the Notes, and the full amount of FP Group's management fees.  Now, Debtors have to add the payment of professional fees, something which this Court is aware is accruing at a significant rate given the number of attorneys involved for Debtors during any given hearing in these cases.  Fourth, Debtors cannot operate the Hospitals themselves as Debtors have no employees.  In seeking to retain Arcadia in lieu of FP Group, Debtors recognize Eldridge and One Cura are incapable of managing and operating the Hospitals.  Debtors, thus, are required to bring in an entirely new management team and propose to hire an entirely new staff at the Hospitals, notwithstanding the "excellent" care currently being provided at the Hospitals during the middle of a world-wide pandemic and near capacity census.  All this Debtors seek to do with a company that has just come into existence post-petition, likewise has no employees, is not currently authorized to do business in Oklahoma, and whose ability to operate Debtors is dependent upon third-party financing and third-party contracts that do not currently exist.

The Court also cannot accept that the absolute priority rule would not apply in these Bankruptcy Cases.  Debtors are owned 100% by One Cura - so there are equity interests.  And those equity interests clearly stand to benefit if they are allowed to keep their interests in the form of the $125,000 monthly director's fee received by One Cura.  Although a decision need not be made on the application of the absolute priority rule at this time, most of the cases cited by Debtors can be readily distinguished because there is literally no equity holder in the debtor.  Here, One Cura holds the equity interests and was quick to argue the absolute priority rule does not apply, thereby revealing its true motive for these Bankruptcy Cases being the protection of its economic interests at the expense of creditors.

7.    <u>Whether the Chapter 11 filing stopped the foreclosure</u>- The foreclosure, eviction, and appointment of a receiver in the State Court Action were stayed by the filing of Debtors'

---

[15]Debtors claim FP Realty, under the unsigned Amended Staffing Agreement, was required to "cure" the unpaid rent arrearage by the end of the Initial Term (February 2023).  The Court is not required to determine this issue but notes that the circumstances surrounding the Amended Staffing Agreement are unusual at best, in dispute, and would require litigation to conclusively determine, which would take a substantial amount of time and money to resolve, something which Debtors seriously lack at this point in time.

bankruptcy petitions.  Prior to the Petition Date, Debtors had already lost in the State Court Action as to the appointment of a receiver.  The District Court had previously ordered a receiver appointed in the State Court Action although the parties had been unable to agree on the terms of the order appointing him.  A hearing on the terms of the order appointing the receiver was scheduled for November 4.  Rather than face the consequences of losing the receiver battle, Debtors sought protection in bankruptcy and stayed any further action in the State Court Action on the appointment of the receiver.  A debtor's primary purpose for pursuing bankruptcy relief should be to benefit its creditors, not to forum shop.  In Re LJBV Ltd., 544 B.R. 401, 406 (Bankr. N.D. Ill. 2016).

Additionally, while Eldridge expressed concern that the receiver would "liquidate" and sell the Hospitals and threatened Debtors' mission of providing health services in Stroud, Anadarko, and their surrounding communities, a receiver could operate the Hospitals, protect the patients by ensuring the continued excellent medical care provided by the current health care providers and staff, while attempting to "right the ship" before seeking to sell them in order to maximize their going concern value for the benefit of creditors and patients rather than equity holders.[16]

8.  <u>Whether petition was filed to gain tactical advantage in litigation or otherwise evade an order of another court </u> - In the State Court Action, Debtors objected to the motion for appointment of a receiver, and prepared and argued at a hearing in September 2020 against the appointment of a receiver.  The District Court then ordered the appointment of a receiver on September 25, 2020, and directed the parties to submit an order appointing the receiver.  When the parties could not agree, a hearing to settle the order was set for November 4, 2020, in the State Court Action.  Rather than risk losing again in the State Court Action and consequently losing control of the Hospitals, Debtors preemptively filed the bankruptcy cases.  Where a debtor appears to be more concerned with who obtains the assets, it may be that the case is more about dodging state court foreclosure rights than a reorganization. LJBV Ltd., 544 B.R. at 406.

9.  <u>Whether the Debtors' pre-petition conduct has been improper</u> - While the Court cannot say that Debtors' conduct has been improper pre-petition per se, Debtors' actions pre-petition evidence a desire to protect One Cura's ownership interests and payment stream

---

[16]Neither FP Group nor Debtors are as altruistic as they both purport to be.  It is clear that their purposes in being part of the Hospitals is generating revenue and obtaining a portion of that revenue in some form or fashion.  While FP Group did not receive interest payments on the Notes nor rent on the Lease for over 9 years, and likewise did not receive 100% of the management fees earned, FP Group still managed to profit over $18 million in each of 2016, 2017 and 2018.  One Cura, which has only one employee, Eldridge, and which relies entirely on FP Group to operate and manage the Hospitals, demanded payment of increasing director's fees through the years to $125,000 per month for both Hospitals, all while Debtors' losses continued to increase.  Moreover, one of its clearly articulated purposes in filing the Bankruptcy Cases was to ensure the payment of its director's fee and its professionals.

at the expense of Debtors' third-party vendors and patients. Debtors' third-party vendors were being paid current in the ordinary course of business as FP Group consistently prioritized their payment over payment of its own interest, rent, and management fees. Rather than coordinate with FP Group on the timing of the Bankruptcy Cases, Debtors filed the cases on a Sunday afternoon without warning to or discussion with FP Group, who operated and managed the Hospitals in every respect. Third-party vendors, service providers, and even employees were caught by surprise. Many vendors took steps to protect themselves which hindered FP Group's ability to operate the Hospitals and directed attention away from patient care. Again, while the surprise filing was not improper per se, given the circumstance that Debtors do not operate the Hospitals but FP Group does, some level of coordination with FP Group should be expected and was quite frankly warranted and reflects a bad faith motive in filing.

"When a chapter 11 case is filed for an improper purpose, i.e. to unreasonably deter, hinder, or harass creditors, rather than to achieve the legitimate objectives of a chapter 11 case, i.e. to preserve a business as a going concern or to maximize the value of the estate for the benefit of creditors, a court may conclude that a chapter 11 case was filed in bad faith." Bullseye Energy, 2020 WL 6928198.

When viewed in their totality, six out of the foregoing nine factors favor dismissal of this case as being in the best interests of the estate and creditors for being a bad faith filing. Debtors clearly expressed their motive was to protect the equity interests of One Cura and its receipt of director's fees and payment of its professionals at the cost of third-party vendors who, prior to the Petition Date, had been paid in the ordinary course of business and were exerting no pressure on Debtors, and FP Group. Debtors want to preserve the cash generating Hospitals for their own benefit rather than give up control to RH Acquisition and lose the Lease to FP Realty, neither of which has received payment since 2011. Against these facts, Debtors' motives are clear, bad faith is found. Where it appears a debtor commences a chapter 11 case in an effort to frustrate and delay its creditors' legitimate efforts to enforce their rights and gain a tactical litigation advantage in bankruptcy, the bankruptcy case is filed in fad faith and sufficient cause exists to dismiss under Section 1112. In re On the Ocean, Inc., 2016 WL 8539791 (Bankr. S.D. Fla. 2016) (court found a lack of good faith and an absence of a legitimate purpose for filing bankruptcy where lease for Debtor's premises expired pre-petition; there were few unsecured creditors, limited tangible assets, no employees so reorganizing a business to save jobs was not a consideration, and underlying dispute with landlord involved state law issues already pending in state court, and petition filed day prior to hearing on appointment of a receiver for the leased premises).

The Motion to Dismiss is granted under Section 1112.

### III.    THE COURT CAN DISMISS UNDER SECTION 305(a)(1).

11 U.S.C. § 305(a)(1)  provides:

> The court, after notice and a hearing, may dismiss a case under this title, or may
> suspend all proceedings in a case under this title, at any time if—
> (1) the interests of creditors and the debtor would be better served by such
> dismissal or suspension;

Abstention is an extraordinary remedy, with dismissal appropriate thereunder only in the situation where the court finds that both "creditors and the debtor" would be "better served" by a dismissal. In re Eastman, 188 B.R. 621, 624 (9th Cir. BAP 1995).  See also In re Hatfield, 2008 WL 906505 (N.D. Cal. 2008); Forest Hill, 364 B.R. at 824. Granting relief under Section 305(a) should be invoked sparingly.  In re Naartjie Custom Kids, Inc., 534 B.R. 416, 425 (Bankr. D. Utah 2015) (citing In re Monitor Sigle Lift I, Ltd., 381 B.R. 455, 462 (Bankr. S.D. N.Y. 2008) and In re Colonial Ford, Inc., 24 B.R. 1014, 1023 (Bankr. D. Utah 1982)).  Bullseye Energy, 2020 WL 6928198. Like dismissal under Section 1112, a decision under Section 305(a)(1) is committed to the sound discretion of the Court based on a case-by-case analysis.  In re Westlake Property Holdings, LLC, 606 B.R. 772, 778 (Bankr. N.D. Ill. 2019) (citing In re Int'l Zinc Coatings & Chem Corp., 355 B.R. 76, 82 (Bankr. N.D. Ill. 2006)); Forest Hill, 364 B.R. at 824.

As the statutory language provides, the test under Section 305(a) is neither whether dismissal would give rise to a substantial prejudice to the debtor nor whether a balancing process favors dismissal, but rather whether both the debtor and the creditors would be "better served" by a dismissal.  Westlake Property, 606 B.R. at 779 (citing In re Eastman, 188 B.R. 621, 624 (9th Cir. BAP 1995)); In re Naartjie Custom Kids, Inc., 534 B.R. 416, 425 (Bankr. D. Utah 2015) (citing In re Monitor Sigle Lift I, Ltd., 381 B.R. 455, 462 (Bankr. S.D. N.Y. 2008)).  The burden of proof regarding abstention rests on the party seeking abstention.  In re G3 Marina Adventures, LLC, 2010 WL 4736212, at *3 (Bankr. E.D. Okla. 2010) (citing In re Forest Hill Funeral Home & Memorial Park, 362 B.R. 808, 819 (Bankr. E.D. Okla. 2007); Bullseye Energy, 2020 WL 6928198.

Courts generally consider seven factors in determining whether to dismiss under Section 305(a)(1): (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of the parties; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and creditors can do an out-of-court work out; (6) whether a non-federal insolvency proceeding is far advanced; and (7) the purpose for which the bankruptcy jurisdiction has been sought.  Naartjie Custom, 534 B.R. at 425 (citing In re Zapas, 530 B.R. 560, 572 (Bankr. E.D. N.Y. 2015); In re AMC Investors, LLC, 406 B.R. 478, 488 (Bankr. D. Del. 2009)); In re Picacho Hills Utiity Co., Inc., 2013 WL 1788298 (Bankr. D. NM 2013)   Not all factors are given the same weight, and the inquiry is made on a case-by-case basis.  Naartjie Custom, 534 B.R. at 425 (citing Monitor Single, 381 B.R. at 464; Picacho Hills, 2013 WL 1788298 (citing In re Iowa Trust, 135 B.R. 615, 622-623 (Bankr. N.D. Iowa 1992))).

-24-

The Courts' analysis of the seven factors dove tails much of the discussion of the factors considered for dismissal under Section 1112(b)(4). First, given the acrimonious relations between One Cura, Debtors, and FP Group, the Court is highly doubtful that the litigation of their various rights and claims will be more efficient and economical in bankruptcy court than in the State Court Action. And, in fact, based on number of professionals actively representing Debtors (and, for that matter, FP Group) in hearings before this Court, the Court fears that bankruptcy may prove much more costly. Moreover, the District Court was close to entering a receiver order after 10 months of litigation; whereas, the bankruptcy cases are relatively new and only in the early stages of litigation. Second, the State Court Action is available to protect the interest of all parties. Given that Debtors operate the Hospitals virtually filled to capacity with patients at the time of the hearing on the Motion to Dismiss, this Court must also consider the interests of the employees and patients. In re Southern Healthcare Systems, Inc., 2003 WL 24027460 (Bankr. M.D. La. 2003). One Cura and Eldridge, with the preliminary arrangement for assistance of Kirrane, Arcadia, Cohesive and Southern Plains, cannot operate the Hospitals and protect the patients better than the current management, medical providers, and other staff, who are on board and providing excellent care per Eldridge himself and are intimately familiar with Debtors and their operations. Eldridge, on the other hand, clearly lacks the knowledge of, and experience in, Debtors' operations.

Third, a receiver has been selected in the State Court Action and stands ready to proceed to "right the ship" and maximize the value of the estate assets as soon as the terms of his order of appointment are finalized. The receiver can protect the Hospital licenses which are tied to the land and buildings owned by FP Realty. Moreover, state law contract issues will have to be determined as to (i) enforceability and, if enforceable, the interpretation, of the Amended Staffing Agreement and (ii) whether the Lease terminated. Fourth, the receivership in the State Court Action can be used as a means for an equitable distribution of Debtors' assets while also protecting the interests of the patients and the value of the licenses.

Fifth, unfortunately, it is highly unlikely that these warring parties could achieve a consensual settlement of their claims without some court intervening. But the District Court has already done so and can continue to resolve the parties' disputes. Sixth, these bankruptcy cases have pended for two months and are in their infancy. Eldridge's and Kirrane's testimony concerning the formulation of a plan and the extremely preliminary and uncertain nature of the "arrangements" with Arcadia, Cohesive, and Southern Plains for future management of the Hospitals, illustrate the very early stage of these cases and Debtors' development of reorganization plans. Seventh, as previously discussed, the primary purpose of the bankruptcy cases is clearly the protection of One Cura's equity interest in Debtors and consequently its stream of monthly director's fees and professional fees.

None of these factors weigh in favor of the bankruptcy cases remaining pending rather than being dismissed under Section 305(a)(1) to allow the State Court Action to proceed. This is a classic two-party dispute, and a two-party dispute that has been litigated for 10 months in the State Court Action. The District Court is more than capable of resolving all of the issues between the parties in the State Court Action while preserving and protecting the Hospitals, the

creditors, and the patients. "Debtors are not entitled to have the Bankruptcy Court hear their complaints merely because they are disgruntled with the process in the State Court." <u>In re Muskogee Environmental Conservation Co.</u>, 236 B.R. 57, 66-67 (Bankr. N.D. Okla. 1999). And, nothing suggests that dismissal is not in the best interest of Debtors and creditors and it will cease the mounting administrative expenses herein.

For these reasons, the Motion to Dismiss under Section 305(a)(1) is also granted.

## **CONCLUSION**

For the reasons set forth above, the Motion to Dismiss is granted, and the motion to use cash collateral is denied as moot due to the dismissal of the Bankruptcy Cases.

IT IS SO ORDERED.

\#   \#   \#